*In re* J.W., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Lisa Williams, Respondent-Appellant).

First District (2nd Division)   No. 1—87—2665

Opinion filed August 29, 1989.

Randolph N. Stone, Public Defender, of Chicago (Karen E. Tietz, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund and Marilyn F. Schlesinger, Assistant State's Attorneys, of counsel), for the People.

Patrick T. Murphy, Public Guardian, of Chicago (Mary Burns, Assistant Public Guardian, of counsel), guardian *ad litem.*

JUSTICE SCARIANO delivered the opinion of the court:

Following a bench trial, respondent, J.'s mother, was found unfit, her parental rights were terminated and a guardian authorized to consent to adoption was appointed. She now appeals, raising the following issues: (1) whether she should be required to follow her various service plans when those service plans did not comply with statutory guidelines; (2) whether she was proved to be an unfit parent by clear and convincing evidence; and (3) whether the trial court improperly considered evidence relating to J.'s best interest in making his decision as to respondent's unfitness.

J., born May 10, 1982, was first removed from respondent's custody in July 1983, when he was 15 months old, after his mother beat him about the head. He was subsequently returned to respondent in May 1984. Shortly thereafter, respondent left J. at her mother's home and, after she failed to call for him, respondent's mother contacted the Department of Children and Family Services (hereinafter DCFS). On May 25, 1984, a petition for adjudication of wardship was filed, alleging that J. was neglected and abandoned due in part to the mental disability of his mother. After an adjudication of wardship, the Department of Children and Family Services (DCFS) placed J. with the Travis family in a foster home supervised by Central Baptist Family Services (Central Baptist). J. continues to live with the Travises. On January 28, 1985, the court entered a finding of neglect, on May 25, 1985, a petition to appoint a guardian with the right to place J. was granted, and on July 9, 1986, a petition to appoint a guardian with the right to consent to adoption was filed. A default judgment was entered against J.'s father, and the following evidence was presented at the hearing on the petition.

Michael Brady, a social worker with Central Baptist, testified that he first became involved with J. in October 1984, and worked on his case until May 1985. From June 1984 to August 1984 respondent's "whereabouts were unknown." Brady continued working with the ser-

vice plan created by DCFS in June 1984, under which respondent was to work towards three goals: (1) engage in regular visitation; (2) establish a working relationship with her caseworker; and (3) participate in counseling at Greater Oak Lawn Mental Health Center. In December 1984 Brady established a new service plan, with the "overall goal to reunite mother with child." Intermediate goals were to initiate regular visitation, to participate in counseling at Greater Oak Lawn Mental Health Center, to establish a relationship with the Central Baptist social worker, to work more cooperatively with Central Baptist, and to divulge her address so that Central Baptist could assess her current living situation. Brady testified that the entire service plan was explained to respondent.

Respondent was to visit J. in Central Baptist's offices "at least once a month," in a room "conducive to interaction," with a couch, toys, books and other activities. She made the five visits she scheduled from December 1984 through June 1985; however, Brady characterized the quality of her visits as "poor." Rather than interacting with J., respondent spent much of the time talking with Brady about her own case. Brady would attempt to direct respondent's attention to J., but respondent insisted upon talking with Brady. Brady also stated that he did not feel respondent had developed a working relationship with him, as representative of Central Baptist, because she would not reveal her address, and thus he had to rely on her phoning him to arrange a visit, and on a number of occasions she became "very angry and hostile on the phone," used abusive language and hung up. Additionally, respondent did not participate in counseling, which was required because of a diagnosis that she "was schizophrenic, undifferentiated type, with strong paranoid features."

On cross-examination, Brady stated that respondent was very interested in seeing her clinical evaluation, but he informed her that it was confidential and he could not share it with her. When talking with respondent about the importance of counseling, "she would become very defiant, and she would frequently say 'I am not crazy.'" With regard to visitation, Brady testified that he attempted to establish a regular visitation schedule, but because he had to wait for respondent to contact him, visitation remained on a monthly basis.

Tracey Livingston, a foster care worker at Central Baptist, worked with J.'s case from June 1985 to June 1986. After six-month case reviews, she devised two service plans for respondent, with the goals of maintaining regular visitation with J., engaging in therapy on a regular basis, maintaining adequate housing and disclosing her address to Central Baptist. Respondent made nine visits during the per-

iod June 1985 to June 1986, the general quality of which Livingston described as poor. According to Livingston, respondent did not know how to interact appropriately with J., and she was more interested in talking with Livingston about her own case. Livingston suggested that respondent arrive 30 minutes in advance of the scheduled visit, so that they could discuss her service plan and any other issues, after which respondent could then direct her full attention to J. when he arrived. But respondent did not follow through on this offer. Visits were often cancelled, because respondent would fail to call the day before to confirm that she was coming. At some point, respondent expressed a desire to visit twice a month, and Livingston agreed. Visits were never longer than an hour, however, because the visits "were pretty upsetting" to both respondent and J., and extending them would not have been in their best interest.

Livingston testified that respondent attended North Rogers Park Mental Health Center in December 1985 for an "intake," but she attended only once, and her case was then closed. She initiated contact with Northtown Rogers Park in February 1986 and "attended sporadically" until May 1986, attending 7 out of 12 appointments. In May 1986, her contact left Northtown and, because there was no further contact from respondent, her case was closed. According to Livingston, respondent did not consistently participate in therapy, even though she attended appointments, because she was not actively taking part and working towards treatment goals. Livingston stated that respondent was "very preoccupied with seeing her psychological evaluation." During this time, respondent continued to refuse to disclose her address.

Mary Wehrle, a clinical therapist at Northtown Rogers Park Mental Health Center, first came into contact with respondent on December 30, 1986. Respondent was to attend weekly sessions, which she did for five weeks. Wehrle encouraged respondent to attend parenting classes, as required in her service plan, but respondent refused, maintaining that she had no problem with her children. According to Wehrle, respondent had "a strong tendency to blame others for her problems." On February 2, 1987, respondent informed Wehrle that she "wanted a therapist who would agree with her that the abuse and neglect charges were all lies." Wehrle would not agree to this, and, as a consequence, they did not meet again until March 27, 1987, when Wehrle told respondent that she would have to attend four parenting classes before she could continue counseling. The reason Wehrle gave for this was that respondent "was not able to identify any material herself to work on regarding herself and her relationship with her

son," and that the classes "might enable her to understand the nature of the problem"; Wehrle also felt that, rather than continuing to discuss respondent's denial, it was time to do something about it. Respondent refused to attend the classes. In Wehrle's opinion, "there was [no] successful outcome in the therapy in terms of seeking the classes or making a plan to provide a structured home, or to addressing [respondent's] basically emotional situation between herself and her child."

According to Wehrle, a psychiatrist with Northtown rejected the diagnosis that respondent was a paranoid schizophrenic, saying there was no evidence of psychosis. Respondent informed Wehrle that she sought counseling because she had been told to do so.

Patricia Kraning, a social worker with Central Baptist, worked with respondent and J. from June 1986 until June 18, 1987, the date she testified at the hearing. Respondent had six visits with J. from June 1986 through December 1986 and eight from December 1986 to June 1987. Respondent was often late to these visits, and thus many of them were less than an hour in duration. Kraning also described the quality of the visits as poor. Respondent returned to counseling in December 1986, because the trial date for the termination proceedings was approaching, but she continued to refuse to attend parenting classes. In June 1987 respondent informed Kraning that she had been living with her mother since J. had been removed from her care and that she had refused to disclose her address because her mother was in the process of adopting respondent's daughter, M., and that if DCFS knew that respondent was living there, M. would have been removed. The adoption was final in June 1987, so respondent no longer felt it necessary to keep her address a secret. Kraning testified that she did not feel respondent had made reasonable progress toward the return of J.

Leslie Travis, J.'s foster mother, testified that she has requested DCFS to have J. tested because of problems he has playing with other children. At the time the judge made his ruling, these test results were not finalized.

In her testimony, respondent denied abandoning J. and stated that she had left him with her mother while she went shopping and that she was on her way to pick him up when her mother called DCFS. She claimed that Northtown told her to stop coming to counseling because they "didn't really like to get involved in court cases and stuff." She did not attend parenting classes because she lacked carfare to get to them. She also claimed to have secured employment in a factory two days prior to testifying, and that J.'s father had not at-

tended the hearing because it was "too hard for him emotionally." Respondent disagreed with the testimony that the quality of her visits with J. was poor, saying that J. was confused and that she had done her best, given that there were other people in the room with them.

In granting the petition seeking termination of respondent's parental rights and the appointment of a guardian with the right of consent to adoption, the trial court stated:

> "As to mother in this case, Lisa Mary Williams, I find the evidence sufficient to clearly and convincingly establish parental unfitness, predicated on chapter 37, section 5—9 and chapter 40, section 40, paragraph 1501(d)(m), specifically that mother has failed to make reasonable efforts to correct the conditions which were the basis for the removal of the child from parents within 12 months after adjudication of neglect. And mother has failed to make reasonable progress towards the return of the child to parents within 12 months after adjudication of neglect.
>
> I think it is important to indicate for the record and for the edification of the parent[,] mother's behavior over the years can be characterized substantially as follows: Mother has failed to rectify her parental deficiencies which [led to] the child being removed some number of years ago. Mother has demonstrated a lack of cooperation with the agencies and with the social workers who sought to assist mother to regain custody of the minor. Mother has demonstrated irresponsible[,] apathetic and irresolute behavior in doing what was required to regain custody of the minor. Mother has demonstrated a lack of commitment necessary to complete the terms of service plans which would lead to the reunification of mother with the minor respondent. Mother has demonstrated a general and conscious disregard of parental duties and obligations to the child. Mother has failed to give paramount consideration to the child's well being. And mother has demonstrated over the years a satisfaction to allow the child to remain in a state of limbo; neither exerting the necessary efforts to regain custody of the child, nor wishing the minor to be adopted.
>
> In short, I think mother's actions have spoke[n] much more loudly than her words. Therefore, based upon the findings of unfitness as to both mother and father, at this time I find it is in the best interest of the minor and the best interest of the community that all parental rights be terminated. And that will be the order.
>
> I further find that it is in the best interest of the minor and

the community that Gary T. Morgan be appointed guardian of the person of the minor respondent with the right of consent to the child's adoption."

Respondent now appeals from the granting of the petition, first arguing that she should not be required to follow her service plans because those plans did not comply with statutory guidelines, and that, because the State's evidence of unfitness consisted solely of violations of these invalid plans, the finding of unfitness must be vacated. The guidelines provide in part as follows:

"(a) The Department recognizes that there is a strong correlation between regular parental visits and contacts with a child and the child's discharge from placement service. Therefore, when a child is in placement and the permanency goal is return home, parent-child visits, telephone calls at reasonable hours, and mail are encouraged unless they have been prohibited by court order. The responsible agency shall arrange for parent-child visits and shall advise parents that repeated failure to visit according to the visiting plan shall be considered a demonstration of a lack of parental concern for the child and may result in the Department seeking a termination of parental rights.

(b) When the permanency goal is to return home, a visiting plan shall:

\* \* \*

(4) specify that parents shall be expected to visit weekly unless there is documentation to the contrary in the case/record;

(5) increase in length unless specific harm to the child is caused by the visits;

(6) specify visiting in the home of the child's parents, if consistent with the safety and well-being of the child. When visits in the home of the child's parents are not consistent with the child's safety and well-being, visits shall be in the most homelike setting possible. Office visits are acceptable if structure is necessary to evaluate or protect the child; and

(7) specify the responsibilities of the Department, the purchase of service providers, the parents, and the child in regard to visitation." 89 Ill. Adm. Code §305.7 (1985).

■ Respondent contends that she was not informed by each social worker that in order to regain custody of J., she had to cooperate with them; however, the record is clear that respondent was told of such requirement.

Respondent also complains that she was allowed only one visit per month, rather than weekly visits as provided for in the guidelines, that the visits were not increased in length, and that they were always in Central Baptist's office. Respondent also relies on a recent settlement in a Federal lawsuit, *Bates v. Johnson* (N.D. Ill. April 3, 1986), No. 84—C—10054, which, *inter alia*, requires caseworkers to attempt to resolve transportation problems which make it difficult for parents to visit their children. Respondent claims that her lack of money made it difficult for her to get to the visits on time and that the caseworkers made no arrangements to aid her with her transportation problems. She also complains that she was not told of her right to appeal the social workers' decisions on visitation, as required by the settlement.

In response, the State argues that the issue is not reviewable, because respondent failed to bring her claims to DCFS for an administrative hearing. In addition, it notes that respondent never expressed dissatisfaction with the service plans when they were in effect, and it cites the testimony that because respondent would not reveal her address, the social workers had to wait for her to initiate contact and arrange visits, and that respondent did this monthly, at best. It further notes Brady's testimony that respondent was to visit at least once a month, as well as the fact that when respondent expressed a desire for more frequent visits, the social workers readily agreed. With regard to respondent's complaint that the visits were not lengthened in duration, it cites the testimony that respondent was often late for the visits, they were of poor quality, and thus it would not have been in anyone's interest to lengthen them. Finally, the State notes that there could be no home visits, because respondent would not reveal her address, and that the room in which the visits were made was "conducive to interaction." It further notes that there was testimony that respondent wanted the visits at Central Baptist's offices.

Respondent next contends that the State failed to prove by clear and convincing evidence that she is an unfit parent. The State alleged that respondent was unfit in that she failed to make reasonable efforts to correct the conditions which were the basis for removal of the child or failed to make reasonable progress toward the return of the child within 12 months after the adjudication of wardship. Ill. Rev. Stat. 1985, ch. 40, par. 1501—1(D)(m).

The first clause of that section addresses the parent's failure to correct the conditions which were the basis of removal, in this case neglect and abandonment. Respondent contends that she made signifi-

cant efforts to correct these conditions, claiming that she "consistently called and arranged visits and then attended them," that she is currently employed, that she has a suitable living arrangement, and that she has offered "a reasonable explanation" for her earlier failure to disclose her address. Respondent relies on *In re Bennett* (1980), 80 Ill. App. 3d 207, 399 N.E.2d 272, in which the appellate court found that the mother's "continuing and regular contact with her daughter," as well as her successful employment and participation in individual and group counseling, demonstrated a reasonable effort. 80 Ill. App. 3d at 210-11.

■■ ■ A finding of parental unfitness must be supported by clear and convincing evidence (*In re Paul* (1984), 101 Ill. 2d 345, 352, 461 N.E.2d 983), and a trial court's finding of unfitness will not be disturbed on review unless it is against the manifest weight of the evidence. (*In re Bennett* (1980), 80 Ill. App. 3d at 210.) What constitutes a "reasonable effort" is a subjective determination (*In re Bennett*, 80 Ill. App. 3d at 210), and the trial judge's finding that respondent has failed to make a reasonable effort to correct the conditions which were the basis of removal of J. is not contrary to the manifest weight of the evidence. There was testimony that respondent did not cooperate with the social workers, did not follow through with counseling, refused to attend parenting classes, cancelled many of her visits with J. and failed to interact with him when she did visit. Such evidence clearly supports the trial court's decision.

■ The trial judge also found that respondent failed to make reasonable progress toward the return of J. within 12 months after the adjudication of wardship. Reasonable progress has been defined as follows:

> " '[A]ccordingly, the term "reasonable progress" requires at a minimum measurable or demonstrable movement toward the goal of return of the child. *** Such an inquiry might well involve consideration of the limitations of the parents, but also would necessarily require consideration of the possibility that the child might be forced to indefinitely reside with a succession of impermanent foster parents. Reasonableness may also depend on the situation which led to removal of the children, since slight progress in correcting a situation which was relatively mild could be viewed as more satisfactory than the same degree of progress in correcting a situation that greatly endangered a child.' " (*In re Doolan* (1981), 101 Ill. App. 3d 322, 325, 427 N.E.2d 1348, quoting *In re Austin* (1978), 61 Ill. App. 3d 344, 350, 378 N.E.2d 538.)

In *Doolan*, the court found that the mother had made reasonable progress toward the return of her child after the initial 12-month period had expired, and held that by presenting evidence and argument concerning the mother's progress after the 12-month period, the parties had conceded that her fitness should be measured by her progress after that period. *Doolan*, 101 Ill. App. 3d at 326.

Respondent claims that she made reasonable progress in achieving her goal of gaining custody of J., while the State maintains that respondent "can point to no objective evidence that she has accomplished any task of the service plan to move closer to her goal." Again, the evidence supported the trial judge's findings, and his ruling was not against the manifest weight of the evidence.

Finally, respondent argues that the trial court erred in considering evidence of J.'s best interest in determining whether she was an unfit parent. The State asked the three caseworkers whether it would be in J.'s best interests to be adopted; however, respondent complains only of the questions put to Tracey Livingston, as well as Ms. Travis' testimony. Livingston stated that she believed it was in J.'s best interest to be adopted, and Travis described J.'s relationship with her and her family and the progress he had made since coming to live with them. In allowing the questions to Livingston, the judge stated:

> "There are two issues. *** [The first] is whether or not parents are fit or unfit and whether or not it is in the best interest of the minor to be adopted even though there might be findings of unfitness. It is readily conceivable that parents may be found unfit and yet it is not [in] the best interest of the minor to terminate parental rights. So both are intertwined and *** exist at all times in this proceeding. I find the inquiry is relevant."

With regard to Travis' testimony, the judge stated:

> "[T]here are two issues involved; the issue of best interest permeates these matters from beginning to end. I mean that's what these cases are all about, the best interest of the child. And the court cannot ignore that simply because there has been a petition filed alleging that *** the parents are unfit, and seeking adoption.
>
> Both issues are relevant. The court is aware that before it can even consider ordering any type of adoption it must first find that the parents are unfit by evidence which is clear, and which is convincing to this court."

The State argued that they were presenting this evidence as a matter of judicial efficiency, because if respondent was found unfit then the judge would have to consider J.'s best interest.

■■ A finding of unfitness is a prerequisite to addressing the question of the child's best interest (*Perkins v. Breitbarth* (1981), 99 Ill. App. 3d 135, 424 N.E.2d 1361.) Here, the judge was aware of the law, and based on the record, there is no reason to believe that he considered incompetent evidence in determining that respondent was an unfit parent.

For all the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

BILANDIC, P.J., and HARTMAN, J., concur.